RICHARD FERGUSON *vs.* HOST INTERNATIONAL, INC.[1]

No. 97-P-1599.

Middlesex. September 9, 1999. - October 26, 2001.

Present: ARMSTRONG, C.J., GILLERMAN, & PORADA, JJ.

*Practice, Civil,* Summary judgment. *Employment,* Termination, Personnel manual. *Contract,* Employment.

In the circumstances of an employer-employee relationship, it could not be said as a matter of law that the employee could not have reasonably believed that the employer would adhere to the portions of a manual establishing a system of progressive discipline and the guarantee of fair treatment, rather than apply them only when it chose. [101-103]

In a proceeding on a motion for summary judgment in which the plaintiff, an employee discharged for "misconduct," claimed that he had rights greater than those of an employee at will that were accorded him through a personnel policies manual he had signed and that had been distributed to all employees, it could not properly be ruled as a matter of law that the plaintiff's claim was meritless, where, in the context of the language in the manual, the word "misconduct" was required-to be taken to import serious breaches of behavior and the plaintiff's behavior amounted to no more than mere unresponsiveness; consequently, the plaintiff should have had the benefit of the progressive discipline provided in the manual [103-105], and so much of the judgment as dismissed the plaintiff's claim for breach of contract was reversed [105].

CIVIL ACTION commenced in the Superior Court Department on August 3, 1995.

The case was heard by *Raymond J. Brassard,* J., on a motion for summary judgment.

*H. Brooks Whelan, Jr.,* for the plaintiff.

*Michael A. Fitzhugh* for the defendant.

[1]Although identified as Host International, Inc., in the complaint, the defendant asserts that its proper name is Host Marriott Corporation. However, based on the materials before us, it appears that neither a motion to amend the complaint nor a motion regarding party misnomer under Mass.R.Civ.P. 12(b)(8), 365 Mass. 754 (1974), has been made.

ARMSTRONG, C.J. As this case comes to us on appeal, the sole issue of significance is whether a Superior Court judge was correct in ordering summary judgment to be entered for the defendant, Host International, Inc. (Host), on the plaintiff's claim for breach of an employment contract.

On July 31, 1992, the plaintiff was employed by Host as a sales clerk at a "Dunkin Donuts" counter in a Logan Airport terminal. Following a brief verbal exchange between the plaintiff and a customer, a supervisor, Donnelly, who had not heard the exchange, came on the scene to find the customer, one Bigbie, stalking away from the counter, apparently angry. Donnelly ran after Bigbie and talked with him out of the plaintiff's hearing. So far as appears nothing further was said to the plaintiff until August 3, when he was summarily discharged by Donnelly. Donnelly stated his grounds in a handwritten "notice of disciplinary action" dated that day.[2] The plaintiff, so far as the record shows, never had an opportunity to present his side of the encounter with Bigbie before the discharge, although he did have a post-discharge exit conference with a Host "human resource manager" on August 6.

In the ensuing days Host opposed the plaintiff's application for unemployment compensation, although to no avail: the review examiner found — based, presumably, on the plaintiff's testimony — that the plaintiff "had been working at the very busy counter when [Bigbie] cut through the line of waiting customers who had yet to be served by the [plaintiff], and tried to engage the [plaintiff] in a conversation about the special of the day and the contents of several doughnuts available. Since

---

[2]The notice stated as follows: "On Friday [n]ight, July 31 Richard was working the Dunkin Donuts [u]nit at US Air. I was helping at the TCBY unit when I noticed two gentlemen go to the Dunkin [u]nit. They left quite abruptly & I followed them to the cafe. I [a]pproached them to ask if something was wrong. The gentleman's quote was, 'The guy was a _____ asshole!' I tried to amend the situation & asked what had happened. The gentleman had asked Richard what today's special meant & his reply was 'Nothin!' The gentleman ask[ed] about other items and got similar rude response[s]. This seems to be a large problem because the gentleman gave me his card and asked to have service contact him because he didn't have time to write down his story. This is a direct violation of Host customer service [p]olicy. These types of actions cannot be tolerated and are considered misconduct. Therefore this will result in Richard being terminated."

the [plaintiff] was working alone, he replied quickly but not rudely to [Bigbie], who then became upset with the [plaintiff], calling the latter an 'asshole,' and walked angrily away." The examiner noted that the plaintiff "had never before been warned about rudeness, although he had been counseled about trying to exhibit a more enthusiastic appearance in the workplace." (The judge could, of course, disregard this account on summary judgment, as it was not "made on personal knowledge," as Mass.R.Civ.P. 56(e), 365 Mass. 825 [1974], requires; but the same account was properly before the judge on affidavits.)

Among Host's arguments for summary judgment was that the plaintiff was an at-will employee, terminable at any time for any reason that is not discriminatory,[3] see *Jackson* v. *Action for Boston Community Dev., Inc.,* 403 Mass. 8, 9 (1988), and that no purpose would be served by a court getting into the question of justification. The plaintiff's claim is that he had rights greater than those of an employee at will, rights accorded through a personnel policies manual distributed to Host's employees generally, and given to the plaintiff, who was asked to sign for it, when he was first hired in November, 1989. The manual, both as it appeared in 1989 and as extensively amended and reissued in 1991, was part of the record before the judge and is before us. The manual as amended was distributed to all employees, including the plaintiff.

Because the plaintiff argues that the manual is the source of his rights in contract, we describe relevant portions of the amended manual in some detail. Following a welcome to new employees and a description of Host as an "industry leader and a leading contributor in your community," and a history of the company, there is a section entitled "ABOUT THE BOOK." The third paragraph of this section disclaims any intent to confer

---

[3]General Laws c. 151B, § 4(1), as amended through St. 2000, c. 254, § 6, bars discharges "because of . . . race, color, religious creed, national origin, sex, sexual orientation . . . genetic information, or ancestry . . . ." The plaintiff, apparently a black person, did in fact file a racial discrimination complaint with the Massachusetts Commission Against Discrimination. That complaint, however, was dismissed because it was filed after the six-month limitations period, and the claim cannot now be resurrected in court. See *Charland* v. *Muzi Motors, Inc.,* 417 Mass. 580, 581, 586 (1994); *Mouradian* v. *General Elec. Co.,* 23 Mass. App. Ct. 538, 543 (1987).

contractual rights on employees,[4] and the fourth paragraph reserves the right to amend or cancel the manual without notice as circumstances require.[5] Four sections later is one entitled "PROBATIONARY PERIOD," informing employees that their first ninety days are ones of evaluation during which they can be terminated without notice.[6] A later section is entitled "PROGRESSIVE DISCIPLINE."[7] It describes how employees who violate· company policies will receive warnings, either verbal or written, which will be placed in the employee's file. A significant paragraph advises the employee, "[i]f you feel the warning is inaccurate or unwarranted, you should exercise your

[4]"The contents of this handbook are presented as a matter of information only and are not intended to create, nor are they to be construed to constitute, a contract, expressed or implied, between the Marriott Corporation and Host/Travel Plazas or any of its employees."

[5]"Host/Travel Plazas reserves its rights to modify, change, disregard, suspend or cancel at any time without written or verbal notice all or any part of the handbook's contents as circumstances may require."

This language and that in note 4, *supra,* also appear in substance as fine print on the page on which the employee can sign to acknowledge receipt of the amended handbook. There is no evidence that the plaintiff was asked to sign for the amended handbook.

[6]"The first ninety (90) days of your employment is considered a probationary period. During this time, your performance will be carefully evaluated. During this time, you may be given additional responsibility, moved to an area that is less demanding or be terminated without notice. Your Manager will do everything possible to help you succeed."

[7]"When policies and procedures are not being followed, it is the responsibility of management to correct the situation. In Host/Travel Plazas this is done by means of our Progressive Discipline Policy. Employees are made aware of concerns and given the help to correct the situation.

"There are two kinds of official warnings:

"Verbal — A record of a discussion that takes place in which the Manager has counseled you about a particular problem. It is then placed in your file.

"Written — A record of more serious offenses or where verbal warnings have proven insufficient. The warning may be in letter or memo form, written warning form or on an appraisal form. You must sign the warning to acknowledge that you have read and understand what is written. Refusal to sign does not invalidate the warning, as a second Manager will be called in to witness the refusal. "If you feel the warning is inaccurate or unwarranted, you should exercise your Guarantee of Fair Treatment. Written warnings expire when they become one year old. Expired warnings can be kept in your employee file for reference, but may not be used to support a termination recommendation after that time. Your Manager will work with you to help you succeed."

Guarantee of Fair Treatment." It explains how warnings expire after one year and cannot thereafter be used to support termination.

The next section, "CONDUCT ON THE JOB,"[8] is central to the plaintiff's argument. It begins by advising that an employee can be terminated under progressive discipline if he has two written warnings and a third violation occurs. The third violation is grounds either for suspension (up to three days) or termination, subject to management's decision. In addition, the employee is told that certain listed violations are so serious that termination can follow even without prior warnings. The list includes such offenses as theft of Host property, possession of

---

[8] "You can be terminated under progressive discipline if you have two written warnings, and a third incident or situation occurs which is a violation of policy or rules or indicative of inappropriate behavior or poor judgment and results in a third written warning. This third situation could also result in suspension, with recommendation for termination. The suspension may be up to three working days without pay and you will be notified in writing.

"After the facts are reviewed, management will inform you of the decision to approve or disapprove the termination.

"An employee can also be discharged for violation of any of the following rules, which are such serious breaches of responsibility to the company that no prior warnings are required (the rules and regulations listed herein are not all inclusive):

"Theft, attempted theft or removal from the premises, without proper authorization, of company property or the property of a customer or another employee.

"Possession of a lethal weapon on company premises.

"Willful damage to company property.

"Gambling on company premises.

"Failing to report to work for three (3) days (consecutive or otherwise) during any three (3) consecutive months without authorization.

"Willful falsification of company records including but not limited to employment applications, payroll, financial reports, timecards etc.

"Hitting, pushing or otherwise striking another person or any other disorderly conduct while on company premises or arising out of company business relations.

"Possession or consumption of alcoholic beverages or drugs or being under the influence of alcohol or drugs on company time or premises.

"Failure to carry out a reasonable job assignment or job request of management after being warned that failure to do so can result in termination.

"Conviction of a felony.

"Misconduct."

lethal weapons on the job, assaults, drug or alcohol use on the job, and a failure after a warning to follow a manager's order — the full list is in the margin at note 8; note should be taken of the last item in the list, "Misconduct," not further described.

Several sections later appears the "GUARANTEE OF FAIR TREATMENT" referred to earlier in the section on progressive discipline. It advises the employee that "[w]e recognize that being human, mistakes may be made in spite of our best efforts. We want to correct such mistakes as soon as they happen." The employee who has a problem is given a three-step procedure to follow, beginning with a discussion with his immediate supervisor; next, one with his manager; then, if the employee is still dissatisfied with the resolution, the manager will arrange for an interview with the general manager. Thereafter, if the employee wishes, "the entire matter will be referred to your Division Director of Human Resources for action."

*Existence of contract incorporating handbook.* Host argues that the employee manual gave the plaintiff no contractual rights because of the clearly stated intent not to create a contract (see note 4, *supra*) and that, in addition, the reservation of a unilateral right to disregard or cancel the manual (see note 5, *supra*) made any contract illusory and unenforceable. Those arguments might have been tenable under language in *Jackson* v. *Action for Boston Community Dev., Inc.*, 403 Mass. 8 (1988), which appeared to recognize the efficacy of such clauses to prevent the creation of contractual obligations to the employee. However, the *Jackson* decision was quite explicitly clarified by the later decision of *O'Brien* v. *New England Tel. & Tel. Co.*, 422 Mass. 686, 691-694 (1996).[9] That decision followed the lead of such cases as *Toussaint* v. *Blue Cross & Blue Shield of Mich.*, 408 Mich. 579 (1980), and *Woolley* v. *Hoffmann-La Roche, Inc.*, 99 N.J. 284, modified on other grounds, 101 N.J. 10 (1985), in calling for the provisions of such manuals to be enforced to the extent that they instill a reasonable belief in the

---

[9]The record does not disclose whether the plaintiff attempted to follow the grievance procedures of the progressive discipline policy, and the defendant made no argument in the trial court or here concerning this matter. See *O'Brien* v. *New England Tel. & Tel. Co.*, 422 Mass. at 695-696 (requiring exhaustion of contract-based remedies).

employees that management will adhere to the policies therein expressed. As explained in the *O'Brien* decision, 422 Mass. at 694:

> "Management distributes personnel manuals because it is thought to be in its best interests to do so. Such a practice encourages employee security, satisfaction, and loyalty and a sense that every employee will be treated fairly and equally. See *Toussaint* v. *Blue Cross & Blue Shield of Mich.*, [*supra* at 613]. Management expects that employees will adhere to the obligations that the manual sets forth. Courts recently have been reluctant to permit management to reap the benefits of a personnel manual and at the same time avoid promises freely made in the manual that employees reasonably believed were part of their arrangement with the employer. Management voluntarily offers, and defines the terms of, any benefit set forth in its unbargained for personnel manual. The employees may have a reasonable expectancy that management will adhere to a manual's provisions. 'Without minimizing the importance of its specific provisions, the context of the manual's preparation and distribution is, to us, the most persuasive proof that it would be almost inevitable for an employee to regard it as a binding commitment, legally enforceable, concerning the terms and conditions of his employment.' *Woolley* v. *Hoffmann-La Roche, Inc.*, [*supra* at 299]. In the circumstances of this case, an affected employee's reliance on the manual would be reasonable, and O'Brien, as one of those employees, is entitled to whatever rights that the manual sets forth."

As to the disclaimer provisions of the Host handbook that the defendant would treat as dispositive, we think the *O'Brien* decision more consonant with the reasonable expectation approach expressed in the *Woolley* decision. "The mere fact of the manual's distribution suggests its importance. Its changeability — the uncontroverted ability of management to change its terms — is argued as supporting its non-binding quality, but one might as easily conclude that, given its importance, the employer wanted to keep it up to date, especially to make certain . . . that the benefits conferred were sufficiently competitive with those available from other employers . . . ." *Woolley* v.

*Hoffmann-La Roche, Inc., supra* at 299. "It would be unfair to allow an employer to distribute a policy manual that makes the workforce believe that certain promises have been made and then to allow the employer to renege on those promises. What is sought here is basic honesty: if the employer, for whatever reason, does not want the manual to be capable of being construed by the court as a binding contract, there are simple ways to attain that goal. All that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing . . . ." *Id.* at 309.

The two clauses in the Host employee manual properly could be viewed by the fact finder as the functional equivalent of fine print. They appear buried in the general, introductory portion of the manual, in a section not as likely to attract the employees' attention as the very specific lists of obligations and benefits set out in the bulk of the manual. It cannot be said as matter of law that the plaintiff could not reasonably believe that the company would adhere to the portions of the manual establishing the system of progressive discipline and the guarantee of fair treatment, rather than apply them only when it chose. Compare *Weber* v. *Community Teamwork, Inc.*, 434 Mass. 761, 780 (2001) ("where an employer calls special attention to the policy, a finding that the terms of the policy form the basis of an implied contract may be justified").

*Breach.* When Donnelly, the plaintiff's immediate supervisor, discharged him, the "notice of disciplinary action" characterized the plaintiff's exchange with Bigbie as "misconduct," see notes 2 and 8, *supra*, presumably to bring the alleged rudeness toward Bigbie within the list of offenses so serious as to warrant bypassing the "progressive discipline" requirement of two prior warnings. Upon closer scrutiny, that characterization gives pause. In isolation, "misconduct" is a term so general that it could be used to mean anything management wanted it to mean. But the term does not appear in isolation, rather it has context in the manual, and in that context the usual and familiar rule of construction applies which treats a general, all-encompassing word at the end of a list of specific items as taking on the

character of those specific items. "The doctrine of ejusdem generis is applicable: 'Where general words follow specific words in an enumeration describing the legal subject, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.' 2A Sands, Sutherland Statutory Construction § 47:17 (4th ed. 1973)." *Dickson* v. *Riverside Iron Works, Inc.*, 6 Mass. App. Ct. 53, 55-56 (1978) (using doctrine to construe contract). See *Santos* v. *Bettencourt*, 40 Mass. App. Ct. 90, 92 (1996) (in statute describing "a place of assembly, theater, special hall, public hall, factory, workshop, manufacturing establishment or building," the word building does not include a house). See also *USM Corp.* v. *Arthur D. Little Sys., Inc.*, 28 Mass. App. Ct. 108, 116 (1989) (interpretation of contract is question of law for court, whose objective is to "construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose"). The items on Host's list purport to be particularly serious breaches of company policy. Most of the items are criminal or borderline criminal conduct — theft, fighting, drug use, gaming, vandalism — or else deliberate disobedience of orders after a warning. (Repeated, unauthorized absenteeism is perhaps of different character but its inclusion does not alter the general character of the list.) In context, the word misconduct must be taken to import similarly serious breaches of behavior. By no account did the plaintiff's behavior amount to more than mere unresponsiveness.[10] There is no suggestion he used foul or abusive language or engaged in any physical action. If the plaintiff was not guilty of "misconduct" as the term is used in the employee handbook, the plaintiff is right in arguing that he should have had the benefit of progressive discipline — i.e., two warnings — and of the guarantee of fair treatment — in effect, a chance to tell his side of the story.

---

[10]In a letter to Host written three weeks after the discharge, Bigbie described the incident thus: "I asked [the plaintiff] (I think his name was Rich) what was special about the special of the day. My friend and I were the only customers waiting and I saw no reason for Rich to be in a hurry. He answered with the response, 'not much.' He then just stared at me for my order. At that time I informed him that I didn't want anything from him, that he was a smart aleck, and that I would go elsewhere for my donut. I stomped away and went inside an adjacent shop to order a donut."

On the evidence before the judge on summary judgment, it could not properly be ruled as matter of law that his claim was meritless.

*Conclusion.* Even viewing the summary judgment record most favorably to the plaintiff, as we have, we recognize that the rights granted to Host employees are not extensive. They do not purport to protect the employee from termination except for cause. The rights granted are simply that the employee, except in cases of egregious misconduct, will have at least two warnings prior to termination and an opportunity to challenge the warnings by telling his side of the story to this supervisor and then to higher authorities. Implicit also is the opportunity given by warnings to improve performance. A court is hardly in a position to treat the right to be heard, the right to tell one's side of the story, as valueless. The employee manual itself recognizes that "mistakes may be made in spite of our best efforts." As the guarantee of fair treatment states, "We want to correct such mistakes as soon as they happen." By its manual, Host may be found to have chosen, "presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation 'instinct with an obligation.' " *Toussaint* v. *Blue Cross & Blue Shield of Mich.*, 408 Mich. at 613, quoting from *Wood* v. *Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 91 (1917). We reverse so much of the judgment as dismisses the plaintiff's claim for breach of contract.[11]

*So ordered.*

---

[11]The plaintiff also claimed in his complaint that his discharge violated Host's obligation of good faith and fair dealing, see *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 104-105 (1977). The claim is meritless and properly was dismissed because nothing in the facts of the case would satisfy the necessary element of unjust enrichment. See *King* v. *Driscoll*, 424 Mass. 1, 6-7 (1996). Because it is not challenged on appeal, we also do not disturb the judge's ruling that the plaintiff's claim for emotional distress damages arising from his termination is barred by the exclusivity provision of the workers' compensation statute.