ROBERT H. LeMAITRE *vs.* MASSACHUSETTS TURNPIKE
AUTHORITY.

No. 06-P-455.

Hampshire. November 16, 2006. - November 5, 2007.

Present: RAPOZA, C.J., LAURENCE, & CYPHER, JJ.[1]

Further appellate review granted, 450 Mass. 1109 (2008).

*Employment,* Personnel manual. *Contract,* Employment, Offer and acceptance.
*Public Employment,* Retirement benefits, Sick leave benefits.

In an action brought by an employee against a former employer, alleging breach of an employment contract, the trial court judge did not err in granting summary judgment in favor of the employee, where the employer's promises, contained in various versions of its employment manual, to reward long-term employees with certain cash and medical benefits upon retirement based on accrued sick leave constituted legally binding offers [637-641] that became irrevocable once the employee signified his acceptance by continuing to work in reliance on their specific terms [642-644], and which the employer breached by refusing to compensate the employee upon retirement at the rates that applied when he earned and accrued his sick leave; however, where the damages award did not reflect the judge's findings with regard to the cash benefit, and where both parties acknowledged on appeal that the calculation of the amount awarded to the employee under the medical benefit provision was in error, this court remanded the matter for recalculation of damages [644].

CIVIL ACTION commenced in the Superior Court Department on April 30, 2004.

The case was heard by *Judd J. Carhart,* J., on motions for summary judgment.

*Richard C. Bardi* (*Michael P. Judge* with him) for the defendant.

*Nicole B. Caprioli* for the plaintiff.

RAPOZA, C.J. The defendant, the Massachusetts Turnpike Authority (authority), appeals from summary judgment entered in favor of its former employee, Robert LeMaitre, on count I of

---

[1]The case was originally heard by a panel comprised of Chief Justice Rapoza, Justice Laurence, and Justice Cypher. Following the retirement of Justice Laurence, the case was submitted on the briefs and record to Justice Armstrong, who was substituted for Justice Laurence on the panel.

his complaint, alleging breach of his employment contract. Upon his retirement in 2002, the authority paid LeMaitre $25,636.76 for the 403 days of sick leave he had accrued since the beginning of his employment with the authority in 1975. In determining the amount due LeMaitre, the authority applied only the provisions of the 1996 personnel policy (which remained unchanged in 2002) to all 403 days of LeMaitre's accrued leave. LeMaitre challenged the award in Superior Court, alleging that the authority owed him additional compensation for the days of sick leave he had accrued prior to 1996, when the authority's personnel policies contained more generous provisions.[2] The judge found for LeMaitre and, on cross motions for summary judgment, awarded him the $82,317.56 he requested (plus interest and costs).[3] We agree with the motion judge and remand solely on the issue of damages.

1. *Facts.* The following material facts are not disputed. LeMaitre, a nonunion engineer, began his employment with the authority on February 9, 1975, and worked there until he retired on November 30, 2002. At all relevant times, the authority offered an incentive program to "encourage employees to use their sick leave credit only when absolutely necessary, and to reward employees who have unusually good attendance records." The authority had complete discretion in updating and revising the incentive program and did so on several occasions between 1975 and 1996. Its employees were informed of the terms and conditions of the policy and also of the occasional modifications through a succession of handbooks, personnel policy and procedure bulletins, and policy directives (collectively, "personnel manuals").[4] All but the 1996 policy directive indicate that the new procedures "supersede" the previous ones.[5]

---

[2] LeMaitre did not challenge the authority's calculation of amounts owed him for sick leave accrued from 1996 until the date of his retirement.

[3] The judge allowed summary judgment for the authority as to count II of LeMaitre's complaint, alleging violation of G. L. c. 149, §§ 148 and 150 (the Wage Protection Act). LeMaitre does not appeal from that ruling, and it is thus not before us.

[4] In 1981, 1989, and 1996, LeMaitre signed certificates of receipt acknowledging that he had read the sick leave policy and confirming "that the Authority is directing me to read and comply with each policy," including the sick leave incentive program.

[5] In the top right-hand corner of the first page of each bulletin, the authority

The incentive program contained two provisions that are relevant here. Under the first provision ("medical coverage provision" or "medical benefit"), a certain percentage of the value of an employee's accrued, unused sick leave is placed in escrow upon the employee's retirement, to be applied toward the retiree's future health insurance premiums. No further contribution for premiums is required from the retiree until that amount is exhausted. The second provision ("cash payment provision" or "cash benefit") allows employees to receive a lump sum cash payment, based on a certain percentage of accrued, unused sick leave, payable to the employee "at the time of retirement." At all relevant times, both benefits were available only to retirees with ten or more years of service, and the medical benefit required the accrual of a minimum number of days, which LeMaitre satisfied. Although the percentages varied from time to time, the calculations were to be made according to the employee's regular rate of pay at the time of retirement.

When LeMaitre was first hired in 1975, the medical benefit was calculated at twenty-five percent of a retiree's accrued, unused sick leave. At some point during 1978 or 1979, the authority increased the medical benefit to fifty percent of accrued sick leave.[6] The medical coverage provision remained unchanged until October 1, 1996, when the authority eliminated the medical benefit from the incentive program except for employees participating in the authority's 1996 early retirement incentive program.[7]

It is undisputed, on the other hand, that the cash payment provision was in place by December 31, 1979, and was to be

indicated the bulletin "Number" (e.g., "F-8"), followed by the page number (e.g., "page 1 of 6"), the "Effective Date" (e.g., "12-31-79"), and the policy year it "Supersedes" (e.g., "7-2-78").

[6] In his brief, LeMaitre acknowledges that when the judge calculated damages due on the medical benefit, he valued it at fifty percent commencing on February 9, 1975, LeMaitre's date of hire, even though the benefit then was set at only twenty-five percent. An issue arises, however, as to when the rate changed from twenty-five to fifty percent, the resolution of which cannot be made on this record. In any event, the ambiguity of the record on this point is not material to our conclusion that LeMaitre is due some amount under the medical coverage provision, notwithstanding its elimination in October, 1996. See discussion, infra.

[7] The record on appeal does not indicate whether LeMaitre met the eligibility criteria for the authority's 1996 early retirement program. In any event, he remained with the authority until 2002.

calculated at the rate of fifty percent of the employee's accrued, unused sick leave.[8] In 1996, at the same time the authority eliminated the medical benefit, it reduced the cash benefit to twenty percent of accrued, unused sick leave.

The parties agree that LeMaitre had an exceptional record of attendance with the authority for close to twenty-eight years. During that entire time, LeMaitre used only 14.5 days of sick leave, often reporting for work even when the use of a sick day would have been justified.[9] Having used only one and one-half days of sick leave between 1975 and 1997, LeMaitre accumulated the majority of his sick leave during the period when the more favorable provisions of the incentive program were in effect. Nevertheless, upon his retirement in 2002, the authority compensated LeMaitre for all of his accrued, unused sick leave at the rate of twenty percent — the rate provided in the cash payment provision of the 1996 incentive program, still in effect in 2002. Also in keeping with the 1996 program, LeMaitre received no payment toward his medical insurance premiums.

2. *Discussion.* On appeal, the authority contends that the judge erred in relying on *O'Brien* v. *New England Tel. & Tel. Co.*, 422 Mass. 686 (1996), in concluding that the personnel ·manuals constituted an implied contract. Thus, according to the authority, LeMaitre was paid the proper amount, as he had no contractual right to payments under the earlier provisions of the incentive program, which the authority had discontinued by the time he retired.[10]

Whether a contract exists is a question of fact. *Jackson* v.

---

[8]LeMaitre claimed that the cash benefit was already in place when he commenced employment with the authority in 1975. The motion judge found that the incentive program contained no cash benefit provision until December 31, 1979. However, as the damages award was not consistent with the judge's findings, the award must be corrected on remand.

[9]For example, on one occasion, LeMaitre had surgery to insert a steel pin in his right hand, which limited his ability to drive. He nevertheless managed to get a ride to work so he did not use any sick time. On another, he dislocated his shoulder, yet worked rather than use sick time. Additionally, so as to avoid using sick time, he scheduled medical, eye care, and dental appointments after work hours and frequently came to work despite an earache, cold, or flu symptoms.

[10]The authority also argues that LeMaitre's breach of contract action is barred by the relevant statute of limitations, a claim we conclude to be without merit. "The general rule is that a contract action accrues at the time the

*Action for Boston Community Dev., Inc.*, 403 Mass. 8, 9 (1988), citing *Maynard* v. *Royal Worcester Corset Co.*, 200 Mass. 1, 4-5 (1908). Summary judgment is appropriate however, where, as here, there is "in essence . . . no real dispute as to the salient facts or if only a question of law is involved." *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 715-716 (1991), quoting from *Community Natl. Bank* v. *Dawes*, 369 Mass. 550, 553 (1976).

It is well settled in Massachusetts that the terms of a personnel manual may become an implied part of an at-will employee's employment contract, and the authority does not argue otherwise. See, e.g., *Pine River State Bank* v. *Mettille*, 333 N.W.2d 622, 627 (Minn. 1983) (cited approvingly in *O'Brien* v. *New England Tel. & Tel. Co.*, 422 Mass. at 693) ("personnel handbook provisions, if they meet the requirements for formation of a unilateral contract, may become enforceable as part of the original employment contract"). See also *Jackson* v. *Action for Boston Community Dev., Inc.*, 403 Mass. at 13, citing *Hobson* v. *McLean Hosp. Corp.*, 402 Mass. 413, 415 (1988); *Weber* v. *Community Teamwork, Inc.*, 434 Mass. 761, 780-781 (2001); *Ferguson* v. *Host Intl., Inc.*, 53 Mass. App. Ct. 96, 101-102 (2001). The authority instead argues that any offer contained in the personnel manuals was unenforceable because the authority retained an implied right to (and did on many occasions) modify the terms of the incentive program. Consequently, the authority asserts, because the offers contained in the personnel manuals could be modified at its own election, LeMaitre obtained no vested right to his accrued, unused sick leave pay. In any event, the authority claims that even if LeMaitre obtained a contractual right to his accrued sick leave, LeMaitre assented to forfeiting those rights as evidenced by his continued employment with the authority after changes were announced that "superseded" previous policies.

contract is breached." *Berkshire Mut. Ins. Co.* v. *Burbank*, 422 Mass. 659, 661 (1996). *Barber* v. *Fox*, 36 Mass. App. Ct. 525, 527 (1994). Here, LeMaitre alleges that a breach occurred in 2002 when he retired and the authority informed him that all of his accrued sick time would be paid in accordance with the terms of its 1996 incentive program. Therefore, under the six-year statute of limitations period provided in G. L. c. 260, § 2, LeMaitre's claim does not expire until 2008. Given that LeMaitre filed the present action in 2004, the case was timely brought and was well within the requisite time period.

For the reasons discussed more fully below, we conclude that in the circumstances presented here the authority's promises contained in the various versions of the incentive program were enforceable. Each constituted a legally binding offer to reward employees with certain cash and medical benefits that became irrevocable once an employee signified his acceptance. We also conclude that as soon as LeMaitre began earning and accruing sick leave after each legally binding offer was made, he indicated his acceptance of that offer; and that at the time he retired in 2002, LeMaitre met all of the conditions for payment under each separate offer, having completed ten years of service and also having accrued the minimum number of unused sick leave days called for in the medical coverage provisions. In other words, once LeMaitre accepted the authority's various offers by continuing to work in reliance on their specific terms, the rights he accrued thereunder could not be extinguished. Consequently, as there is no indication that LeMaitre agreed to forfeit the benefits to which he became entitled during each successive period, the authority breached its agreement by refusing to compensate LeMaitre upon retirement at the rates that applied when he earned and accrued his sick leave.

a. *The existence of an offer.* Apparently relying on *Jackson* v. *Action for Boston Community Dev., Inc.*, 403 Mass. at 14-15, the authority claims that any offers or promises made by the express terms of the incentive program were "illusory," and thus nonbinding, solely because the authority made frequent unilateral changes to the provisions in the personnel manuals. See *Graphic Arts Finishers, Inc.* v. *Boston Redev. Authy.*, 357 Mass. 40, 43 (1970) ("a promise that binds one to do nothing at all is illusory and cannot be consideration"), citing *Gill* v. *Richmond Co-op. Assn.*, 309 Mass. 73, 79-80 (1941).

According to the authority, even though it was not expressly stated in the personnel manuals, LeMaitre was nevertheless aware that the authority retained the right to alter the incentive program whenever it chose to do so. Recognizing that *O'Brien* v. *New England Tel. & Tel. Co.*, *supra*, "call[ed] for the provisions of [personnel] manuals to be enforced to the extent that they instill a reasonable belief in the employees that management will adhere to the policies therein expressed," *Ferguson* v.

*Host Intl., Inc.*, 53 Mass. App. Ct. at 101-102, the authority argues that because LeMaitre was aware of the authority's right to make unilateral changes and also knew of the changes, he could not have reasonably expected the authority to adhere to any of its promises. We disagree. The mere fact that management can make unilateral changes to a personnel manual would not, standing alone, lead an employee to conclude that rights already obtained would be altered or taken away by such changes. Rather, an employee "might as easily conclude that, given [the manual's] importance, the employer wanted to keep it up to date . . . to make certain . . . that the benefits conferred were sufficiently competitive . . . ." *Id.* at 102-103, quoting from *Woolley* v. *Hoffmann-La Roche, Inc.*, 99 N.J. 284, 299, modified on other grounds, 101 N.J. 10 (1985). See *O'Brien* v. *New England Tel. & Tel. Co.*, 422 Mass. at 692-693.

The authority regularly distributed the personnel manuals, which spelled out in explicit detail the terms of each version of the incentive program in effect at different times during the course of LeMaitre's employment. LeMaitre and presumably other employees were even required to sign for them. See *O'Brien* v. *New England Tel. & Tel. Co.*, *supra* at 694, quoting from *Woolley* v. *Hoffmann-La Roche, Inc.*, 99 N.J. at 299 ("the manual's preparation and distribution is, to us, the most persuasive proof that it would be almost inevitable for an employee to regard it as a binding commitment, legally enforceable, concerning the terms and conditions of . . . employment"). Moreover, as to the express terms of the incentive program, the authority does not argue that they were meant only to provide guidance to its employees. See, e.g., *Jackson* v. *Action for Boston Community Dev., Inc.*, 403 Mass. at 14-15 (noting that "[t]he personnel manual's language that it is provided for 'guidance' as to the defendant's 'policies' " is some indication "that any 'offer' made by the defendant in distributing the manual was illusory"). Indeed, the authority admits the incentive program was intended to encourage employees to decline the use of sick time that they might otherwise be eligible to use. Additionally, the authority's explicit promises to make future cash and medical payments conditioned on employees' remaining with the authority for at least ten years was an inducement for LeMaitre

to stay with the authority for financial reasons, "a course of action [he] . . . might not otherwise have taken." *Graphic Arts Finishers, Inc.* v. *Boston Redev. Authy.*, 357 Mass. at 43. In the circumstances, such conduct by the authority created the reasonable expectation in its employees, including LeMaitre, that the authority would adhere to the terms of each version of the incentive program stated in the personnel manuals with respect to sick time earned and accrued during each successive period.

Moreover, had the authority intended to make no legally binding promises, it should have included in the personnel manuals "in a very prominent position . . . an appropriate statement that there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing . . . ." *Ferguson* v. *Host Intl., Inc.*, 53 Mass. App. Ct. at 103, quoting from *Woolley* v. *Hoffmann-La Roche, Inc.*, 99 N.J. at 309. None of the materials in the record before us contains any language that comes close to satisfying this requirement.

> "It would be unfair to allow an employer to distribute a policy manual that makes the workforce believe that certain promises have been made and then to allow the employer to renege on those promises. What is sought here is basic honesty: if the employer, for whatever reason, does not want the manual to be capable of being construed by the court as a binding contract, there are simple ways to attain that goal."[11]

*Ferguson, supra,* quoting from *Woolley, supra.*

[11]Although the authority claims that its use and placement of the single word "supersedes" in the upper right-hand corner of the first page of each bulletin accomplished this goal, we conclude otherwise. On its face, it does nothing more than announce a change from the previous bulletin. At best, the word "supersede" is ambiguous, and must be construed against the authority as the drafter. See *Electronic Data Sys. Corp.* v. *Attorney Gen.*, 440 Mass. 1020, 1021 (2003). Moreover, a single word buried in the top corner of one page contained in multi-page bulletins conveys no strong statement indicating that the authority makes "no promise of any kind" in the incentive program. Compare *Ferguson* v. *Host Intl., Inc.*, 53 Mass. App. Ct. at 99 n.5, 101, 103 (text hidden in obscure section of personnel manual providing that the employer "reserves its rights to modify, change, disregard, suspend or cancel at any time without written or verbal notice all or any part of the [manual's] contents" was "functional equivalent of fine print" and thus insufficient to make terms

b. *LeMaitre's acceptance of the offer and accrual of benefits under the incentive program.* Having concluded that each version of the authority's incentive program constituted a new binding offer that LeMaitre could reasonably conclude was "a statement of the conditions under which [his] employment would continue," *O'Brien* v. *New England Tel. & Tel. Co., supra* at 693, we take the view, as discussed more fully below, that the authority's offer was not, as the authority urges, a mere gratuity, but rather a form of employee compensation contingent on continued employment and services rendered while the provisions were in effect. See, e.g., *Attorney Gen.* v. *Woburn,* 317 Mass. 465, 467-468 (1945), and cases cited (when an offer of a bonus to an employee is made as a means "to secure continuous service from an employee, to enhance his efficiency and to augment his loyalty to his employer," it resembles more of a legally binding offer to pay a wage rather than a promise of a gift or gratuity). See also *Averell* v. *Newburyport,* 241 Mass. 333, 335 (1922) (school committee's decision to expand provision of paid sick leave to teachers was "on same footing as an increase of salary," and was regarded as "an additional incentive to superior work," "not a mere gratuity"); *Fitchburg Teachers Assn.* v. *School Comm. of Fitchburg,* 360 Mass. 105, 106-107 (1971) (bonus for unused sick leave not a gratuity but part of over-all bargained-for package of services and benefits).

At all relevant times, each version of the incentive program offered a specified future economic reward in exchange for an employee's good attendance. Indeed, the explicit purpose, as stated in the personnel manuals, was to "encourage employees to use their sick leave credit only when absolutely necessary, and . . . reward employees who have unusually good attendance records." Of necessity, however, good attendance requires continued employment, and implicit in the program's generous terms and ten-year service requirement is an intent to attract qualified applicants and to induce employees to remain with the

in manual illusory or unenforceable). Last, even if we were to find some merit in the authority's argument concerning the inclusion of the word "supersede," the record shows that it is missing from the October 1, 1996, policy directive, which announced, for the first time since LeMaitre began his employment there, new incentive program terms that proved to be comparatively less lucrative than previous ones.

authority over an extended period. Thus, in the circumstances here, the authority's offer to make payment at a future date is not an offer of a mere gratuity that could be retracted capriciously. Rather, it became part of LeMaitre's implied employment contract governing his over-all compensation.[12]

We therefore agree with the motion judge that where it is undisputed that LeMaitre, in reliance on the promises of future payment for his accrued, unused sick leave, completed the requisite ten years of service, exhibited an exemplary attendance record over a career with the authority that spanned nearly three decades, and otherwise complied with the terms and conditions called for under each version of the incentive program, his performance constituted a valid acceptance of the authority's successive offers, thus meeting all the requirements for the formation of a binding unilateral contract in each instance.[13] See *O'Brien* v. *New England Tel. & Tel. Co.*, 422 Mass. at 693, citing *Pine River State Bank* v. *Mettille*, 333 N.W.2d at 626-627. See also *Zampatella* v. *Thomson-Crooker Shoe Co.*, 249 Mass. 37, 39 (1924) (offer of bonus on percentage of yearly wages was sufficiently definite to ripen into legally enforceable contract once the employee continued in the defendant's employment relying on the defendant's promise); *Attorney Gen.* v. *Woburn*, 317 Mass. at 467 ("employee's acceptance of the offer [of a salary bonus] by performing the things called for by the offer binds the employer to pay the bonus"); *Balkin* v. *Frank M. Katz, Inc.*, 373 Mass. 419, 421-422 (1977) (upon a showing at

---

[12]*Glynn* v. *Clerk of the Superior Ct. for Criminal Business in Suffolk County*, 404 Mass. 1002 (1989), is not to the contrary. There, unlike here, without the protection of either a statute or proof of an enforceable contract, the employee could not establish that he "had a reasonable expectation in the circumstances shown on the record that . . . future benefits [under a prior sick leave policy] were guaranteed." *Id.* at 1003, citing *Foley* v. *Springfield*, 328 Mass. 59, 61 (1951), and *McCarthy* v. *Sheriff of Suffolk County*, 366 Mass. 779, 782, 784 (1975).

[13]Retirement was therefore not a condition precedent to each offer's ripening into an enforceable contract, as the authority suggests. Rather, retirement was merely the event that triggered the authority's time to perform under each legally binding agreement. Moreover, our conclusion that the authority failed to indicate that any policy changes were to have retroactive effect, see note 11, *supra*, also disposes of the authority's argument that LeMaitre forfeited any rights he may have had by continuing on the job after changes were made to the incentive program.

trial that employee continued employment in reliance on employer's promise of a pension, evidence would be sufficient to demonstrate that the promise was a binding obligation; employee's reliance would constitute sufficient consideration to warrant a conclusion that a contract to pay a pension had been formed); *Pine River State Bank* v. *Mettille*, 333 N.W.2d at 629 ("[h]andbook provisions relating to such matters as bonuses, severance pay and commission rates are enforced without the need for additional, new consideration beyond the services to be performed").

3. *Calculation of damages on remand.* As previously noted, see note 8, *supra,* LeMaitre's damages award pursuant to the cash payment provision did not reflect the judge's findings. Additionally, both parties acknowledge on appeal that the calculation of the amount awarded to LeMaitre under the medical coverage provision was in error. See, e.g., note 6, *supra.* Consequently, the matter must be remanded for the judge's recalculation of damages.

4. *Conclusion.* As to count I, alleging breach of contract, there was no error in the denial of the authority's motion for summary judgment and the allowance of LeMaitre's motion therefor. The judgment as to count I is vacated, and the matter is remanded solely for a determination of damages owed LeMaitre consistent with this opinion. LeMaitre's request for costs is allowed. See Mass.R.A.P. 26(a), as amended, 378 Mass. 925 (1979).

*So ordered.*