Curran, Dennis J.,
J. The plaintiffs Nancy Metelus, Rodyn Normil, and Mimóse Renois have filed this employment discrimination action on the basis of national origin (count I) and breach of contract (count II) against the defendants Wingate Healthcare, Inc. and Wingate at Reading, Inc. (collectively, “Wingate”). At present, Wingate has moved for summary judgment.
BACKGROUND
I. Discipline and Termination
Wingate operates a nursing home. The plaintiffs were employed by Wingate as certified nursing aides at its Reading, Massachusetts facility. Ms. Metelus, Ms. Normil, and Ms. Renois are all of Haitian descent. Until the incident that led to their termination, none of the plaintiffs had a disciplinary record, and all relevant performance reviews were positive.
On April 27, 2011, the plaintiffs were scheduled to work the 3 p.m. to 11 p.m. shift on the third floor of Wingate’s facility. At the beginning of the shift, Leisha Lawlor, a nurse working on the second floor, called the third floor and requested that a female CNA “float” to the second floor.[2] Irene Munene, a nurse on the third floor, informed the plaintiffs that someone from the third floor needed to float to the second floor. At Wingate’s facilify, CNAs are expected to follow nurses’ instructions.
The parties dispute exactly what Ms. Munene told the plaintiffs. Both Ms. Munene and Ms. Lawlor testified that a female CNA was specifically requested because there were not enough female employees to assist female patients on the second floor. Ms. Munene testified that she informed the plaintiffs that she needed a female to float, and requested that one of the plaintiffs float because all of the other CNAs on the third floor at that time were male. The plaintiffs all testified that they were not informed that a female CNA was needed, and thought that a male CNA could float.
All three plaintiffs refused the nurses’ instruction to float to the second floor. Ms. Metelus stated that if she was forced to float, she would go home because she did not feel well. There is conflicting evidence as to whether Ms. Renois and Ms. Normil also threatened to walk out if they were forced to float.[3]
A little while later, Ms. Lawlor requested for a second time that a CNA float to the second floor. The plaintiffs again refused. A male CNA ultimately floated to the third floor because Wingate could not “run a floor if everyone walk[ed] off the job . . .” Exhibit B.
The incident was brought to Janine Gilchrist, Wingate’s Director of Nursing. Ms. Gilchrist decided that the plaintiffs’ behavior warranted an investigation and began by speaking with Ms. Munene and Ms. Lawlor. After speaking with them, Ms. Gilchrist concluded that all three plaintiffs should receive written warnings based on the August 27th incident. When issuing the warnings, Wingate met with each plaintiff and gave them the opportunity to present their side of the story. Ms. Metelus and Ms. Normil’s warnings were issued on September 2, 2011; Ms. Renois’s warning was issued on September 6, 2011.
The written warnings were largely identical and stated that they were based on the refusal of the CNAs to float to the second floor and their threat to walk off the job in the middle of the shift. Ms. Gilchrist then learned of a second incident that occurred on September 1, 2011 where Ms. Renois was both insubordinate and disrespectful toward nurses on her floor.[4] Thus, Ms. Renois’s written warning also referred to this incident.
During her investigation into the August 27th and September 1st incidents, Ms. Gilchrist began to become concerned about the behavior of all three plaintiffs. She interviewed nurses Olivia Namubiru and Winifred Kabogah who worked on the same floor as the plaintiffs to determine whether there was an ongoing pattern of insubordinate behavior. Ms Gilchrist testified at deposition that based on her investigation, the plaintiffs had threatened and intimidated other employees. The nurses told her that all three plaintiffs were disrespectful, insubordinate, regularly refused assignments, and did not follow directives; in short, they had no intention of complying with the nursing home’s patients’ needs.
The plaintiffs were not questioned as part of the investigation. Further, the allegations against Ms. Metelus and Ms. Normil involving threatening behavior were made verbally and not put into writing. There is some question as to whether all of the allegations related to all three plaintiffs or only concerned Ms. *17 Renois. Lastly, Ms. Namubiru testified that she did not tell Ms. Gilchrist that she felt personally threatened by the plaintiffs.[5]
Ms. Gilchrist brought the results of her investigation to Wingate’s director of human resources. She was particularly concerned with the plaintiffs’ intimidating and threatening behavior. After discussing the matter, Wingate decided to terminate all three plaintiffs on September 12,2011. Their written termination reports stated:
You refused to float and threatened to walk off the job. Your actions created an intimidating environment that affected the staff and residents. Most importantly, your actions threatened resident care, diminishing our ability to ensure our residents were cared for in the manner consistent with Wingate standards.
Exhibit F.
II. Similarly Situated Employee
On December 11, 2011, Wingate issued a non-Haitian CNA a written warning for refusing to float. Her warning stated that the CNA was loud and argumentative and ignored a resident’s call bell. The CNA was not terminated for her actions.
III. The Employee Handbook
Wingate considers its employees, including the plaintiffs, to be “at-will” employees. Wingate’s application for employment and offer letter explicitly explained the “at-will” nature of the employment relationship.
Upon beginning their employment with Wingate, each plaintiff received an employee handbook for which each signed an acknowledgement which stated:
I understand that the contents of this Handbook are presented as a matter of guidance only. The plans, policies and procedures described herein are not conditions of employment. The Company reserves the right to unilaterally modify, revoke, suspend, terminate or change any and all such plans, policies and procedures, as it sees fit, with or without notice at any time.
The language used in this Handbook does not constitute a contract between The Company and any one or all of its employees. Indeed, employment at The Company is “at-will”; this means that an employee or The Company may terminate the employment relationship at any time, for any reason.
Exhibit BB.
Further, the employee handbook contained the following Disclaimer:
The contents of this Employee Handbook have been designed to acquaint you with the Company. They are not all inclusive and are only a set of guidelines intended to help you understand expectations both from you and the Company. The plans, polices and procedures described herein are not conditions of employment. The Company reserves the right to unilaterally modify, revoke, suspend, terminate or change any and all such plans, policies and procedures as it sees fit with or without notice at any time
The language used in this Handbook does not constitute a contract between the Company and any one or all of its employees, nor does it guarantee employment for any definite period of time. We are an “at-will” employer and operate under the provision that employees have the right to resign their position at any time, with our [sic] without advance notice and with our [sic] without cause. We, the employer, have similar rights to terminate employment at any time, with or without notice and with or without cause.
Exhibit J.
The employee handbook also addressed the issue of employee discipline. The handbook listed examples of misconduct, however, the list was “not all-inclusive [,] but merely serve[d] as a guide.” Exhibit K. Further, the handbook provided that employees who failed to follow the rules would be disciplined, “ranging from verbal counseling, written warnings, suspension, or termination . . . based upon the seriousness of the violation, the employee’s work record and length of service, and the needs of the facility.” Id. Although it stated that employees were subject to progressive discipline, Wingate “reserve[d] the right to accelerate or skip disciplinary measures as necessary based on the needs and safely of the facility.” Id. Ms. Gilchrist testified that she typically used the employee handbook as a guide with respect to employee discipline and did so when disciplining the plaintiffs. She explained, however, that she does not always follow the employee handbook if she believed that an employee’s actions warranted harsher discipline.
DISCUSSION
I. SUMMARY JUDGMENT STANDARD
A court grants summary judgment when there are no genuine issues of material fact. See Mass.R.Civ.P. 56(c). The burden is on the moving party to demonstrate the absence of a triable issue and that it is entitled to judgment as a matter of law. Id.; Madsen v. Erwin, 395 Mass. 715, 719 (1985). Where the burden of proof at trial rests with the non-moving party, the moving party may satisfy its summary judgment burden by either presenting “affirmative evidence negating an essential element” of the non-moving party’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991).
“Where a moving party properly asserts that there is no genuine issue of material fact, ‘the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.’ ” Id., quoting Anderson v. *18 Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). All of the evidence must be viewed in the light most favorable to the non-moving party. Foster v. Group Health, Inc., 444 Mass. 668, 672 (2005).
II. EMPLOYMENT DISCRIMINATION ON THE BASIS OF NATIONAL ORIGIN (COUNT I)
A. Standard of Review
There is a three-stage order of proof in employment discrimination cases where the plaintiff seeks to use indirect evidence to show unlawful discrimination. See Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 440 (1995), abrogated on other grounds by Abramian v. President & Fellows of Harvard College, 432 Mass. 107 (2000).
First, the plaintiff must establish a prima facie case of discrimination Id. at 441. Where the plaintiff has alleged discriminatory termination, the plaintiff must offer evidence to show: “(1) membership in a protected group; (2) performance of her job at a satisfactoiy level; (3) termination from employment; and (4) either the employer’s continued efforts to fill the position or the employer’s hiring of a member of an unprotected group with the same or lesser qualifications than the plaintiff.” Boston Public Health Comm’n v. Massachusetts Comm’n Against Discrimination, 67 Mass.App.Ct. 404, 407-08 (2006); see also Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 541 (1995) (“the facts necessary to establish a prima facie case of discrimination will vary depending on the circumstances of each case”). By presenting admissible evidence to establish a prima facie case of discrimination, the plaintiff has created a presumption of discrimination because the employer’s “actions, ‘if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.’ ” See Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 40 (2005), quoting Furnco Conste Corp. v. Waters, 438 U.S. 567, 577 (1978).
Second, if the plaintiff has met her initial burden, the burden shifts to the employer to articulate “a legitimate, nondiscriminatory reason for” its actions. See Blare, 419 Mass. at 441. The proffered reason “may be unsound or even absurd” and “may appear ‘arbitrary or unwise’ ”; “(t]he defendant is not required to persuade the fact finder that it was correct in its belief.” Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 127-28 (1997), quoting Lewis v. Area II Homecare for Senior Citizens, Inc., 397 Mass. 761, 766-68 (1986).
Third, once the employer has articulated a non-discriminatoiy reason for terminating the plaintiff, the burden returns to the plaintiff to show that the employer’s articulated reason is a pretext for discrimination. See Wynn & Wynn, P.C. v. Massachusetts Comm’n Against Discrimination, 431 Mass. 655, 666 (2000), overruled on other grounds by Stonehill College v. Massachusetts Comm’n Against Discrimination, 441 Mass. 549 (2004). “[T]he plaintiff must prove that the explanation given by the employer . . . lacks reasonable support in evidence or is wholly disbelievable.” Lewis, 397 Mass. at 765 “The fact finder may properly take into account ‘weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer’s proffered legitimate reasons for its action.’ ” Salem v. Massachusetts Comm’n Against Discrimination, 44 Mass.App.Ct. 627, 643 (1998), quoting Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994). However, “[t]o withstand a defendant’s motion for summary judgment, a plaintiff claiming discrimination must show something more than a conflict in the evidence regarding the employer’s legitimate, nondiscriminatoxy explanation for the employment decision and the plaintiffs membership in a protected group.” Wooster v. Abdow Corp., 46 Mass.App.Ct. 665, 673 (1999). “[I]f the factfinder is persuaded that one or more of the employer’s reasons is false, it may (but need not) infer that the employer is covering up a discriminatory intent, motive or state of mind.” Lipchitz v. Raytheon Co., 434 Mass. 493, 501 (2001).
B. Analysis
After reviewing the summary judgment record, it is clear that the plaintiffs cannot show a prima facie case of employment discrimination. There is nothing in the record from which the Court could infer either that the plaintiffs’ positions were filled after their termination, that other employees took over the plaintiffs’ duties, or that Wingate made any attempt to fill the positions. The plaintiffs are correct that they need not show that a nonprotected class member filled their positions. See Wynn & Wynn, P.C., 431 Mass. at 665 n.22 (“a plaintiff is not required to establish as part of her circumstantial prima facie case that an employer filled a position with a nonprotected class member”). However, this does not dispense with the plaintiffs’ burden of presenting evidence on the fourth element of their prima facie case. See Beal, 419 Mass. at 544 (“to avoid a grant of summary judgment against her on the G.L.c. 151B claim, the plaintiff must establish that she has a reasonable expectation of proving each element of a prima facie case of . . . discrimination”). Whether or not evidence on this element exists is not for this Court to contemplate, it can only consider the evidence before it. Here, there is simply no record evidence to indicate that the plaintiffs can expect to prove the fourth element of a prima facie case of employment discrimination. See Id.
Despite this, for argument only, the plaintiffs can satisfy their primafacie burden by presenting evidence that a similarly situated employee was treated differently. See, e.g., Sullivan, 444 Mass. at 45-46 (holding that where the employee is terminated as part of a reduction in force, she can satisfy the fourth prima facie element “by producing some evidence that her layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination”). Here, the plaintiffs have provided evidence that a non-Haitian CNA was not terminated when she refused to float to another floor, was loud and argumentative, and refused to answer a resident’s call bell.
*19 In order to be considered similarly situated, “[a] comparator’s circumstances need only be substantially similar to those of the [plaintiff] ‘in all relevant aspects’ concerning the adverse employment decision.” Trustees of Health & Hospitals of the City of Boston, Inc. v. Massachusetts Comm’n Against Discrimination, 449 Mass. 675, 682 (2007), citing Matthews, 426 Mass. at 129. ‘The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated . . . Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.” Id., quoting Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989).
Here, the plaintiffs’ proffered comparator was not similarly situated. First, the plaintiffs received written warnings because they refused to float to another floor and because they threatened to walk out and abandon their nursing home patients if they were required to float. There is evidence in the record that if the plaintiffs had walked out in the middle of their shifts, Wingate would have been short-staffed and may not have been able to properly care for its vulnerable and elderly patients. As the written warnings made clear, Wingate considered its employees walking out on the job an abandonment of their responsibilities to such patients. In contrast, the comparator did not threaten to leave, and only ignored one resident’s call bell. Thus, the written warnings were not equivalent. See Id.
Further, the plaintiffs were not terminated after they received their written warnings, but rather, only after an investigation and additional allegations of insubordinate behavior had surfaced. The plaintiffs’ termination reports stated that the plaintiffs “created an intimidating environment that affected the staff and residents.” Exhibit F. By contrast, there is no evidence of other allegations of misconduct on the part of the comparator. There also is no evidence that the comparator had other disciplinary issues. There is also no evidence that Wingate failed to investigate the comparator after the written warning was issued. Thus, based on the facts in the record, this Court cannot say that the comparator and the plaintiffs were “substantially similar ... in all relevant aspects.” See Trustees of Health & Hospitals of the City of Boston, Inc., 449 Mass. at 682; see also Bond v. Massachusetts Bay Commuter R.R., LLC, 2013 U.S. Dist. LEXIS 166346 at*21-*23 (D.Mass. November 22,2013) (stating evidence was not sufficiently developed to demonstrate comparator was similarly situated).
Finally, the evidence does not support a presumption or inference of unlawful discrimination in this case. See Trustees of Health & Hospitals of the City of Boston, Inc., 449 Mass. at 686-87; Sullivan, 444 Mass. at 45-46. The plaintiffs argue that Wingate’s proffered justification for their termination is a pretext for discrimination. They take issue with the thoroughness of Wingate’s investigation and argue that Wingate provided little written documentation, did not follow the procedures outlined in the employee handbook, and did not interview the plaintiffs. Further, they argue that the majority of the specific allegations concern Ms. Renois, not Ms. Metelus and Ms. Normil, and that none of the nurses testified that they felt personally threatened by the plaintiffs. They also argue that Wingate’s official reason for their termination was the August 27th incident only.
However, other than the fact that the plaintiffs share the same national origin, there is nothing to support a presumption of discrimination. There is no evidence to suggest that non-Haitian employees were treated more favorably than Haitian employees. The undisputed evidence demonstrates that four nurses reported that the plaintiffs were insubordinate. While they might not have felt personally threatened by the plaintiffs, there is no evidence in the record to suggest that the nurses, specifically Ms. Namubiru and Ms. Kabogah who regularly worked with the plaintiffs, did not tell Wingate that all three plaintiffs were routinely and regularly disrespectful, insubordinate, and failed to follow management’s instructions and directions. There is no evidence to suggest that the investigation into the plaintiffs’ behavior was not thorough as compared to investigations of other employees or that other employees received a more favorable investigation.[6] The undisputed evidence shows that Wingate’s investigation was prompted by the August 27th incident and it was not until after the investigation was concluded that the plaintiffs were terminated. Because there is no evidence to infer a connection between the plaintiffs’ termination and their national origin, summary judgment in favor of Wingate is appropriate on count I for employment discrimination based on national origin. See Diorio v. E. Boston Neighborhood Health Ctr., 2009 Mass.App. Unpub. LEXIS 809 at*6-*7 (Mass.App.Ct. June 10,2009) (finding summary judgment appropriately granted in favor of employer where there was no evidence on fourth element of prima facie case and no evidence that a similarly situated employee was treated more favorably).
III. BREACH OF CONTRACT (COUNT II)
A. Standard of Review
The terms of an employee handbook may become an implied contract even in the context of at-will employment. See Lemaitre v. Massachusetts Turnpike Auth., 70 Mass.App.Ct. 634, 638 (2007). Courts are reluctant to allow employers to “avoid promises freely made in the [handbook] that employees reasonably believed were part of their arrangement with the employer.” O’Brien v. New England Tel. & Tel Co., 422 Mass. 686, 694 (1996). This is especially true where employees “have a reasonable expectancy that management will adhere to a [handbook’s] provisions.” Id. While the existence of a contract is a question of fact, summary judgment is appropriate where “there is ‘in essence ... no real dispute as to the salient facts or if *20 only a question of law is involved.’ ” Lemaitre, 70 Mass.App.Ct. at 638, quoting Kourouvacilis v. General Motors Corp., 410 Mass. 706, 715-16 (1991).
B. Analysis
The plaintiffs argue that Wingate’s employee handbook created an implied contract that Wingate breached by terminating them. Specifically, they contend that the handbook contained a progressive discipline policy, which Wingate did not follow.[7] The plaintiffs argue that because Wingate used the handbook as justification for their discipline, it was required to follow the progressive discipline policy.
Here, the plaintiffs did not have a reasonable expectation that Wingate would follow a progressive discipline policy. The employee handbook had neither an explicit nor detailed discipline policy, but merely provided that employees “are subject to progressive discipline ranging from verbal to written warnings” based on a number of factors, including the severity of the conduct, the employee’s work record, and the needs of the facility. See Exhibit K. Moreover, the handbook stated that Wingate “reserves the right to accelerate or skip disciplinary measures as necessary based on the needs and safety of the facility.” Id. The handbook did not state that only certain conduct or egregious conduct would warrant termination. Contrast Ferguson v. Host Int'l, Inc., 53 Mass.App.Ct. 96, 105 (2001) (explaining that the handbook in question provided that “except in cases of egregious misconduct, [an employee] will have at least two warnings prior to termination and an opportunity to challenge the warnings by telling his side of the story to this supervisor and then to higher authorities”). Thus, Wingate did not implement a detailed discipline policy and explicitly reserved discretion to impose a range of discipline on employees subject to a number of factors, including its general needs and safety. Contrast Lemaitre, 70 Mass.App.Ct. at 640 (noting that the employee handbook in question “spelled out in explicit detail” the provisions that the plaintiff claimed were breached and made “explicit promises”). The discretionary nature of the policy alone shows that the plaintiffs did not have a reasonable expectation that Wingate would progressively discipline them.
Moreover, the handbook repeatedly stated that it was intended as guidance only as to Wingate’s policies. See, e.g., Jackson v. Action for Boston Cmty. Dev., Inc., 403 Mass. 8, 14-15 (1988) (noting that “[t]he personnel manual’s language that it is provided for ‘guidance’ as to the defendant’s ‘policies’ ” indicates “that any ‘offer’ made by the defendant in distributing the [handbook] was illusory”). There were multiple, clear, and prominent disclaimers cautioning that the handbook did not create a contract, change the plaintiffs’ at-will employment status, create a term of employment, or provide conditions of employment. See Ferguson, 53 Mass.App.Ct at 103 (“if the employer, for whatever reason, does not want the [handbook] to be capable of being construed by the court as a binding contract, there are simple ways to attain that goal. All that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing”).
Therefore, based on the provisions of the employee handbook before this Court, as a matter of law, the handbook created no implied contract; thus, summary judgment must be granted in Wingate’s favor on this count.
ORDER
For these reasons, the defendants Wingate Healthcare, Inc. and Wingate at Reading, Inc.’s motion for summary judgment must be ALLOWED.
Judgment shall enter for the defendants without costs.

Floating between floors is a common practice at Wingate’s facility, and indeed, in the industry. It generally occurs when an employee fails to show up for a shift. To meet the needs of the patients, employees are floated or redistributed to other floors as needed.

Ms. Lawlor’s written report of the incident indicated that all three plaintiffs threatened to walk out.

In documenting the September 1st incident, nurse Olivia Namubiru wrote: “Other CNAs on [the] unit felt bullied & intimidated by [Ms. Renois], she did not follow nurses [sic] requests & directions, [was] very argumentative and aggressive, [and] she had several complaints from patients.” Exhibit E. Ms. Namubiru also reported that Ms. Renois made a “long hissing” noise at her. Id. Further, nurse Winifred Kabogah wrote that Ms. Renois “was intimidating to the nurses and fellow nursing assistants ... [and was] very aggressive, argumentative, intimidating and rude.” Id.

Ms. Namubiru did testify that one of the plaintiffs (she could not recall which) threatened to “smear poop” on people’s vehicles. See Exhibit 5, at p. 35. She also testified that Ms. Renois sometimes said, “If anybody ever do [sic] anything to me, I will do something back to them.” Id. at 34.

The plaintiffs generally state that Wingate failed to follow the procedures outlined in the employee handbook. However, the portions of the handbook attached to the summaiy judgment record do not suggest strict or detailed procedures and merely lay out what Wingate might do in given situations. The plaintiffs fail to point to any procedure in the handbook that Wingate was required to follow (or regularly followed) and failed to.

The plaintiffs also argue that Wingate failed to follow the “concern resolution” section of the employee handbook. This section of the handbook provides a procedure for employees to follow when they encounter problems in the workplace. The handbook states that Wingate is “committed to: [g]iving prompt and fair attention to issues and concerns raised by employees concerning their treatment at work; and [Resolving such issues in an equitable and businesslike manner.” Exhibit V (emphasis added). Here, however, there is no evidence that the plaintiffs raised any concerns with Wingate or attempted to follow the procedure outlined in the handbook. There is also no evidence that the plaintiffs attempted to utilize this policy after they were issued written warnings. The plaintiffs could not have reasonably believed that Wingate would follow a procedure that was never triggered.