Agostini, John A., J.
INTRODUCTION
The plaintiff, Richard Feriy, brought this action against the Rosewood Construction Corporation and William A. DePietri alleging claims in breach of contract and assault and battery. Specifically, the plaintiff asserts that Rosewood terminated his employment with the corporation in breach of a written employment contract. The plaintiff further asserts that DeP-ietri assaulted and beat him at the time of his dismissal. The defendants deny the allegations and assert that Ferry was properly terminated from employment for job performance reasons. The case was called for ajury-waived trial in January 2007, and was completed on January 31. During the course of trial, six witnesses testified and 53 exhibits were introduced. Based upon the evidence presented at trial, the Court makes the following findings of fact.[1]
FINDINGS OF FACT
Rosewood is a construction company ranging from 20-30 employees that typically is engaged in commercial projects in eastern Massachusetts. It is owned by DePietri and he is also the president and chief executive officer.
In 1997, the plaintiff started working for Rosewood as a project superintendent. His work history included time with the U.S. Army Corps of Engineers, and various construction businesses commencing in 1980. A project superintendent is responsible for coordinating the work *14 in the field with the sub-contractors, insuring quality control, addressing manpower needs and job safety. Essentially, he is responsible for getting the job done on time and on budget. Ferry held a Massachusetts contractor’s license and a home improvement contractor’s license at all time material to this action. He did not hold a Construction Supervisor License.
When the plaintiff first started to work for Rosewood, he was an employee at will with a salary of $45,000 per year, including certain benefits. His initial responsibility was to build Rosewood’s corporate headquarters located in Southborough, Massachusetts. Ferry left this position in 1998 to take a similar job with Bowdon Construction, Inc. and Spirato Construction. During the initial time that the plaintiff worked for Rosewood, he would receive bonuses for the projects that he supervised for bring the projects to completion on time and presumably, on budget.
In January 2000 Paul Slazik, the senior project manager for commercial properties, called the plaintiff in an effort to bring him back to Rosewood. By all accounts Ferry was considered a valuable employee; a “super superintendent” according to DePietri. After some discussions, Ferry returned to Rosewood as project superintendent for $79,000 per year ($ 1,400/week). Specifically, Ferry entered into a one-year written contract of employment that provided him certain benefits, including health insurance, vacation, pension benefits and a company vehicle. The contract was a form employment agreement drafted by the defendant Rosewood and was signed on behalf of Rosewood by Slazik.
During the year 2000 the plaintiff worked on two projects for Rosewood under the direct supervision of Slazik. The first project was the Park Central Project, a 50,000-square-foot office building in Southborough, in which Ferry received a bonus of $5,000 after successful completion of the project. He also worked on a project called Great Way Place. During the entire time that the plaintiff worked at Rosewood, he did not receive any written or oral warnings, reprimands or sanctions.
Up to this time, Rosewood did not have an employment manual for its employees. Ferry was able to obtain a manual from another construction company and provided this manual to Rosewood for its review. After making certain changes, the Employee Benefit Manual of Rosewood Construction Corp. was created and the plaintiff acknowledged receipt of a copy of the manual in writing on October 31, 2000.
The manual has a section on “Disciplined” and that is fairly extensive and breaks violations into two categories: Class A and Class B. Typically for first offense a written or verbal warning is issued, the next offense mandates suspension and a subsequent offense would mean termination. Rosewood recognizes progressive discipline, however retains the right to discharge, demote or suspend an employee without warning for serious offenses. Written notice of all discipline, along with the basic reason for that discipline, will be provided to the employee, as well as placed in the employee’s personnel file.
On February 14, 2001, the plaintiff entered into another written contract for employment. This written contract was drafted by Rosewood and provided the plaintiff with the same fringe benefits as in the prior contract. However, the contract differed in two important respects from the 2000 contract. First, the salary was increased to $82,800 per year. Second, the agreement was for four-year period.[2] Specifically, the language concerning the term of the agreement is as follows:
This agreement constitutes a (4) year guarantee of employment by Rosewood Construction provided that the employee maintains the responsibilities of the JOB DISCRIPTION according to industry standards. (Emphasis in original.)[3]
During 2001, Ferry continued to work on the Great Way Project, an office building in Westborough, Massachusetts. On March 16,2001, he received a bonus check of $3000 for his work on that project. In August 2001, at the direction of the company, Ferry started to focus some of his time and his attention on the Clock Tower Project, a parking garage in Maynard, Massachusetts. By September 12, according to the time records, the plaintiff was the full-time superintendent at Clock Tower.
This project was owned by DePietri. In September, the project was behind schedule having been under control of another project superintendent. There were problems with respect to drainage and a labor force that had trouble communicating in English. The preliminary site work was essentially completed and the parking garage was starting to be erected.
At this point it may be helpful to digress and discuss the plaintiffs personal construction business that he operated under the name of Water’s Edge Associates, a sole proprietorship.[4] This business was operating prior to the time the plaintiff was employed by Rosewood Construction Corp. Typically, the plaintiff would be engaged in reasonably small construction projects, as well as snowplowing through this business. During the summer of 2001, Water’s Edge built a garage for Paul Rodier over a three-month period for approximately $100,000. This was done on Ferry’s off-hours, as the defendant had no restriction on side jobs as long as they did not interfere with the employment responsibilities. Ferry also did some voluntary work for his homeowner association in 2001, building two retaining walls and charging only for the cost of materials.
In 2000 and 2001, independent of his employment obligations, Rosewood hired Ferry, through Water’s Edge Associates, to do snowplowing at the Great Way Project.
Services were rendered on at least three occasions, billed by Water’s Edge and paid in full by Rosewood.
In the fall of 2001, Rosewood hired Water’s Edge Associates to remove demolition materials and mason-ary waste from the Clock Tower Parking Garage project to an unidentified dumpsite in Southborough. This *15 outside work was discussed among Ferry, DePietri and Slazik, with DePietri specifically identifying the site for the waste products to be dumped. The specific price per load was not discussed, except that it would be at “fair market value.”
Over six days during early November 2001, Water’s Edge transported 35 truckloads of waste to the dumpsite. A bill was submitted to Rosewood by Water’s Edge identifying 35 loads at $125 per load for a total of $4,375.00. Given that this work was done during the normal business hours of Ferry, a deduction of $1,500 was made, reflecting the time that Ferry was not working for Rosewood. Consequently, the total bill was for $2,875.00.
This bill was not promptly paid so an overdue notice was sent by fax to the company with a copy to DePietri on December 3, 2001, demanding payment by December 8. This immediately led to a meeting between Ferry and Slazik at headquarters that lasted approximately 10 minutes. Slazik showed Ferry the original invoice interlaced with hand written notes by both DePietri and Slazik. In large letters, DePietri wrote “NFW’ (no fucking way) across the top. In addition, there were notations on the bill from Slazik of what other truckers would charge for similar loads. Finally, at the bottom of page, DePietri proposed a counter offer of $1,567.50. This counterproposal was rejected by Ferry and the matter was left unresolved.
On December 7, 2001, Water’s Edge Associates, through Ferry, filed a small claims complaint in the Westborough District Court seeking the legal maximum of $2,000 for the hauling of waste material off the site. The language of the small claims complaint used somewhat intemperate language that ended with “(t]here response was to write N.F.W. on our bill! This is why we will go to court).” Consequently, for $432.50 ($2,000 small claims limit minus $1,567.50 settlement offer) Ferry sued his employer: a company that recently gave him a munificent 4-year employment contract. Ferry did not advise DePietri that he was taking such action. The court mailed this complaint, by certified mail to Rosewood and it was received on December 19, 2001.
On Friday, December 21, 2001, an eventful day for this litigation, the plaintiff arrived at the job site early in the morning. He was summoned by Slazik at approximately 11 a.m. to come to the main office in the early afternoon. At approximately 12:30 p.m., Ferry arrived at Slazik’s office at Rosewood’s headquarters and was informed that he was being terminated from employment.[5] No specific reason was given for the termination. After expressing surprise, it was agreed by both Slazik and Ferry that Ferry would drive back to the job site with the company vehicle to pick up his tools and he would return to the headquarters to drop off the vehicle. Slazik agreed to arrange to bring Ferry home, given that he lived in Falmouth, a considerable distance fromSouthborough.[6]
Ferry left the office and walked through the garage to the company vehicle. At this point he encountered DePietri in the garage, who sought out this confrontation. DePietri accused the plaintiff of trying to steal his truck and got into his face outside of the building near a retaining wall. As heated words were exchanged, DePietri, with both his hands, pushed the plaintiff in the chest knocking him down. While on the ground the plaintiff called 911 and DePietri retreated inside the garage. Before emergency personnel arrived, Slazik came down from his office and closed the garage door leaving the plaintiff outside. The police and ambulance came to the scene and Ferry was transported to the Marlborough hospital emergency department.
While in the hospital, the plaintiff complained of injury to his left ankle. The ankle was evaluated and x-rayed (negative), and it was noted that there was tenderness and swelling below the fibula. The plaintiff was discharged with an acute sprain, an air splint, crutches and a recommendation for Advil, if necessary. The hospital bill was paid directly by Rosewood. The symptom with respect to the left ankle sprain resolved within the next two to three months.
While in the emergency room, Rosewood shut off the cell phone that was being used by the plaintiff and decided not to transport him home. Consequently, Ferry was required to use the services of a limousine company to transport him to Falmouth at a cost of $200. On December 26,2001, Slazik sent Ferry a letter confirming his termination of employment and forbidding him to return to any job site.
On January 4, 2002, Ferry presented himself to the Falmouth Hospital, emergency department with complaints of pain during the prior three to four days in his lower back, radiating to his leg. He was diagnosed with a lower back strain and given a shot for Toradol for pain management. He was discharged with prescription medicine and advised to stay in bed for two days. As result of this hospital visit the plaintiff incurred medical bills in the amount of $459.66, which was not paid by Rosewood. The symptoms with respect to the lower back resolved within the next few weeks.
On April 16, 2002, the small claims court awarded Water’s Edge Associates judgment in the amount of $1,860 in its claim for payment for hauling services. During the hearing on this matter, Rosewood did not raise the issue of Ferry being unauthorized by the company from doing such work. This judgment was immediately paid.
The plaintiffs civil complaint is in seven counts, essentially seeking damages for breach of the written contract against Rosewood and assault and battery against DePietri and vicariously Rosewood. With respect to the contract claims, the plaintiff asserts that he is entitled to $82,800 per year for the remaining three years, or $248,400, less any offset for income earned during this period. He is also seeking damages for loss of his benefits under the contract. Finally, the plaintiff is seeking damages for his bodily injuries suffered as a result of the assault and battery.
*16 The defendant concedes the existence of a four-year employment agreement, however, it raises an affirmative defense by asserting that it properly terminated the plaintiff from employment for his breach of the employment agreement. Specifically, the defendant alleges that Ferry failed to “maintain the responsibilities of his job description according to industry standards.” The grava-man of this defense concerns the Clock Tower Parking Garage project and the construction defects allegedly caused by the failure of Ferry to properly supervise the project. Through testimony provided by Paul Slazik and William DePietri, a number of problems with the building were identified that required corrective measures, and in some cases remedial cosmetic work. The defendants contend that Rosewood was justified in firing the plaintiff for these errors. Specifically, the defendant asserts that the plaintiffs failure to supervise created the following problems.[7]
1. Excessive cracking of the concrete floors due to not keeping up with the curing process after the floors were poured;
2. Poor layout of the foundation for stair 1, the elevator, and its lobby;
3. Elevator shaft out of square;
4. Wrong layout of the thruwall flashing for the elevator lobby;
5. Incorrect elevation of the elevator pit floor;
6. Excessive concrete and mortar spillage on the floors and the stairwells;
7. Misalignment of the elevator door openings;
8. Poor compaction of the underground plumbing for the drains on floors 1-5;
9. Incorrect layout of the elevator rail inserts.
The defendants have asserted that because of these problems Rosewood had to undertake major corrective action by (1) jack hammering the elevator pit to increase its size, (2) replace the drainage system under the asphalt, (3) redesign and rebuild the roof of one of the stairwell towers, (4) reinstall the elevator rails, and (5) alter a pre-designed stairway.

DISCUSSION

The law with respect to this litigation is reasonably straightforward. In a standard term employment contract, one party may validly terminate the contract upon one of three conditions: (1) natural expiration of the stated term; (2) material breach by the opposing party; or (3) proper exercise of an express contractual provision permitting premature termination. See Kravetz v. Merchants Distribs., Inc., 387 Mass. 457, 460 (1982) (premature termination of an employee breached definite term contract); G.M. Abodeely Ins. Agency v. Commerce Ins. Co., 41 Mass.App.Ct. 274, 278 (1996) (“It is well established that a material breach by one party excuses the other party from further performance under the contract”). The face of Ferry’s contract did set forth a “contract period” of four years from February 2001 to February 2005, and there is no dispute that Ferry was terminated prior to its natural expiration without the defendant’s proper exercise of an express contractual provision.
Even a contract for permanent employment may be terminated for just cause, such as the employee’s failure “to conform to the usual standards of conduct.” See Boothby v. Texon, Inc., 414 Mass. 468, 480 (1993); Klein v. Presidents and Fellows of Harvard College, 25 Mass.App.Ct. 204, 208 (1987). The court’s decision in Klein v. President & Fellows of Harvard College, supra, sets out the standard for a “just cause” termination in Massachusetts.
Even if the plaintiffs employment was for a set, specific period of time, neither her agreement with the university nor the law guaranteed her employment for that period irrespective of her job performance . . . Terms such as just cause, and like phrases have been construed in similar or analogous contexts as meaning: [T]here existed (1) a reasonable basis for employer dissatisfaction with a new employee, entertained in good faith, for reasons such as lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior, or (2) grounds for discharge reasonably related, in the employer’s honest judgment, to the needs of his business. Discharge for a “just cause” is to be contrasted with discharge on unreasonable grounds or arbitrarily, capriciously, or in bad faith. Id. at 208, quoting G&M Employment Serv., Inc. v. Commonwealth, 358 Mass. 430, 435 (1970).
The question whether there is just cause for termination is generally a question of fact and it is an affirmative defense with the burden of proof on the defendant.
A second issue that must be considered is the role that the employment manual plays in this litigation. Massachusetts courts have found that company policy books, and particularly personnel manuals, distributed by employers to employees can create a binding commitment insofar as employees have a reasonable expectation that the employer will adhere to the policies expressed therein. “The principle that promises made in a personnel manual may be binding on an employer is accepted in a clear majority of American jurisdictions... The idea that an employer may ignore promises made in a personnel manual is in increasing disfavor in this country.” O’Brien v. New England Telephone & Telephone Co., 422 Mass. 686, 691 (1996). The key inquiry is whether in light of context of the manual’s preparation and distribution, as well as its specific provisions, it would be objectively reasonable for employees to regard the manual as a legally enforceable commitment concerning the terms and conditions of employment. O’Brien, 422 Mass. at 694; Weber v. Teamwork, Inc., 434 Mass. 761, 779-80 (2001) (‘Where an employee signs a personnel policy ... or where an employer calls special attention to the policy a finding that the terms of the policy on the basis of an implied contract may be justified”); Ferguson v. Host International, Inc., 53 *17 Mass.App.Ct. 96, 102 (2001). Negotiations of the terms of the contract between the employer and the employee are not an essential precondition to enforcement of the manual. O’Brien, 422 Mass. at 692. Further, any disclaimer clauses stating that a manual creates no contractual rights or reserving a unilateral right to modify or cancel the manual, while relevant, are not dispos-itive of whether an employee could reasonably believe that the procedures contained therein bind management. O’Brien, 422 Mass. at 693; Ferguson, 53 Mass.App.Ct. at 102-03.
When policies are presented to employees in such a way as to instill a reasonable belief in the employees that they are terms and conditions of employment, the employer is contractually bound by them. O’Brien v. New England Telephone & Telegraph Co., 422 Mass. 686, 691 (1996).[8] When determining whether certain policies constitute terms and conditions of employment Massachusetts case law has focused the inquiry on the provisions within employee handbooks or personnel manuals and the circumstances surrounding the circulation and distribution of them. See O’Brien, 422 Mass. at 686; Ferguson v. Host International, Inc., 53 Mass.App.Ct. 96, 101 (2001); Derrig v. Wal-Mart Stores, Inc., 942 F.Sup. 49, 54 (D.Mass. 1996). Courts look to the provisions in the handbook and to their production and circulation as a means to discern the way in which the policies contained in them were communicated to the employees. Id. If an employer’s policies are communicated for its own benefit, in away that encourages “employee security, satisfaction and loyalty, a sense that every employee will be treated fairly” and with the expectation that employees will adhere to the policies, courts should be reluctant to refuse to hold management to the promises it makes in its policies. 422 Mass. at 694.
With this in mind, it is reasonably clear that Ferry failed to establish that he relied on the terms of the policy as a condition of his continuing employment at Rosewood. Where an employee signs a personnel policy, negotiates specific terms as a condition of beginning or continuing employment, or where an employer calls special attention to the policy, a finding that the terms of the policy form the basis of an implied contract may be justified. See O’Brien v. New England Tel & Tel Co., supra at 692-93 citing Jackson v. Action for Boston Community Dev., Inc., 403 Mass. 8, 15 (1988). There is no evidence that Ferry assented to the terms of the progressive discipline policy as a condition of his own continuing employment, or even was aware that they existed. The ad hoc implementation of the policy did not alter Ferry’s employment status. Consequently, Rosewood was entitled to terminate Ferry without following the manual or any progressive discipline.
Turning to the evidence in this case, the central inquiry regarding the contract claim is the job performance of Ferry. An employer has the right to terminate an employee, in good faith, for reasons such as lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior. If believed, the nature and extent of the problems outlined by the defendant would warrant termination of the plaintiff. However, I disbelieve the testimony of both Paul Slazik and William DePietri regarding these issues. I find that these assertions are simply a pretext to justify the termination.
First, the defendants must surmount the temporal sequence of events. Rosewood received notice of the small claims action and within a day decided to terminate Ferry. Coincidences are part of life but some coincidences are hard to overlook. Given the reaction that DePietri displayed in receiving the trucking bill, it is difficult to accept that the follow-up lawsuit, with its in-your-face language, was de minimus in the decision to terminate the plaintiff. DePietri was angry over the fact that an employee had the temerity to sue him over a relatively small matter; an employee that he had recently signed to a four year “no-cut” contract. I understand the anger of DePietri as such action by Ferry would generate anger in most employers. The defendants have provided Ferry with a most generous employment relationship, and by all accounts, treated him very well with bonuses, vehicles and the ability to act as a subcontractor on its job sites. This type of employment contract is probably seldom seen in the construction industry.[9] Ferry’s behavior does seem rather petty and short-sighted in the spectrum of things. For $432.50, Ferry was apparently willing to damage a profitable relationship with Rosewood. The anger engendered by the small claim suit is understandable, however, any irritation over the lawsuit does not alter the employment agreement. I find that the small claims suit directly caused the firing. Further, I do not find that Ferry had a Machiavellian motive to orchestrate the firing by filing the court action in order to be relieved of the terms of the contract.
If there was any doubt on the cause of the firing, it was quickly dispelled by the conduct of DePietri in confronting the plaintiff. The scenario proffered by the defendants was that this was an emotionless, business decision by Slazik, well thought out and assented to by DePietri. If so, one would expect a professional parting of the ways, including the opportunity for Ferry to retrieve his tools at the job site as well as transportation to Falmouth. Instead we have a physical confrontation and a messy aftermath.
I accept the version of events regarding the confrontation presented by the plaintiff, depicting a rather bitter exit interview. Slazik, DePietri and Rosewood’s employee, William Congdon, each gave somewhat different versions that were neither consistent nor believable. Slazik remembers that DePietri and Ferry exchanged sharp words and DePietri went to get the keys from the truck. He testified that Ferry fell backward, but did not observe Slazik touch him. Congdon testified that DePietri and Ferry argued for a lengthy period of time,[10] both in the garage and outside in the parking lot. He also did not see any physical touching nor any falling down.[11]
*18 On the contrary, DePietri in his interrogatory answers stated that after he told Ferry not to take the truck, he attempted to take the keys from the plaintiffs hand and, without touching him. The plaintiff fell backwards in an exaggerated, phony-looking motion. In another answer, DePietri claims that he was “justified in his decision to remove the keys from the Plaintiffs possession” as Ferry was planning to drive the vehicle back to the job site. Unfortunately, in his trial testimony, the keys are now in the truck (consistent with Slazik’s version) and in attempting to get to the truck, DePietri “brushed” Ferry causing the plaintiff to throw up his hands and yell, “did you see this?” The differences in testimony are more than just innocent lapses of memory. I simply do not accept the defendants’ assertions that nothing happened and that Ferry summoned the police and ambulance to support a concocted story. I find that there was physical contact initiated by DePietri that was unwarranted and unjustified.
After the confrontation, it does not get any better for Rosewood. Retreating inside the building while police and ambulance personnel were tending to the plaintiff does not bespeak of a business response to a routine employment situation. Immediately turning off Ferry’s cell phone and failing to provide him with a ride to Falmouth are inconsistent with the defendants’ view of events, as well as mean-spirited.
Another aspect of the termination that 1 found troubling was the severity of the discipline. For an employee such as Ferry, who had demonstrated great skills for Rosewood, summary termination seems rather callous and certainly counterproductive. I am surprised that given the successful relationship between Ferry and Rosewood, at least leading up to the four-year contract, Rosewood ignored the progressive discipline procedure under Section L with the heading, “Wages, Salaries & Discipline.” Although, as I have found, the defendant is not required to follow the measures set forth in this section, why not use the progressive discipline with Ferry? Until he started with the Clock Tower Project he was considered a “super” superintendent.[12] If this was simply a business decision, it makes no sense to terminate such a capable employee and disregard the progressive discipline. Onewould think that this would be the perfect place for written warnings or possibly a suspension. To suddenly terminate an employee with a four-year contract without any written warnings or any written support is suspect.
DePietri claimed that he agonized over the decision to terminate Ferry, recognizing that, as he stated, “no project goes smoothly.” But upon Slazik’s insistence that “we have to let him go,” the decision was made to terminate the plaintiff. The fact that the company ran directly to termination rather than a myriad of other sanctions is contrary to their stated position. The defendants believe that Ferry’s problems arose because he was “burning the candle at both ends.” One does not precipitously fire a “super super” under these circumstances, particularly without any written document or egregious conduct. The fact that Rosewood did not even bother to state the reasons for the termination on its letter of December 26, 2001, is further support that the termination was not due to the reasons expressed by the defendants. Simply stated, this termination was due to the small claims suit, with the added benefit that it eliminated a rather onerous four-year employment contract; a contract that Slazik was not in favor of from the beginning.
Let me now turn to the items of substandard work claimed by the defendants. As noted above the defendants set forth an extensive list of items that were improperly constructed due to a failure of supervision. It should be noted that despite claiming great costs in remediating the problems, the defendants failed to introduce any evidence of costs, or any documentary evidence of such corrective action. If the remedial work was done, the cost as testified by DePietri was “hundreds of thousands of dollars.” Surprisingly, no evidence of cost was forthcoming. Keeping in mind that Ferry was only on the site for a little over three months, the defendants attempt to tag him with a variety of supervising misdeeds, including, building a stair tower out of square, improperly installing drain pipes, improperly installing the vortechnics system, and the brick flashing. If such events happened, there would be identifiable costs, as well as documents and, likely, third parties also responsible.[13] There was no such evidence and I was asked to rely on the words of the defendants.
Of greater importance is the fact that despite the significance of the plaintiffs claim, the defendant did not present evidence from non-defendant witnesses (i.e. architect, engineer, subcontractors etc.) regarding these problems. There was no question that such individuals were on site during the project and should have been intimately involved in the process. For example, if the pre-fabricated stairs in the tower did, indeed, have to be custom-fit to accommodate the mis-proportioned tower, there would be records of such work. The absence of such evidence is glaring. The “hundreds of thousands of dollars” of costs that were incurred by Rosewood by the negligence of Ferry never materialized at trial. I find that these costs were not incurred.
Finally, after reviewing the extensive number of photographs of these defects and viewing the workmanship on a site visit, I conclude that any shortcomings of the project were inconsequential. There is some “spider” cracking in the concrete floors, but it is minor and would not be noticed by anyone on the premises. The elevator tower is out of square but only upon very close inspection by a trained eye or a tape measure. This cosmetic defect is hardly the reason to fire an employee, particularly when so many hands were involved in this construction. In sum, my visit to the site showed a reasonably handsome, functioning garage. Unless the standard is perfection in the construction industry, Ferry’s work at this site was not *19 the reason that he was fired. This litany of defects action is a pretext to cover the real reason for the firing.
Continuing with this “kitchen sink” approach, the defendants also seek to tar Ferry with other indiscretions. Specifically, that he failed to keep a daily log book, improperly employed his Water’s Edge business on the sites, and that he misrepresented that he had a Massachusetts Construction Supervisors License. I find that none of these reasons caused the defendant to fire Ferry. In his after-the-fact chronology of events written on July 8, 2002, Paul Slazik gave only two reasons for the termination: “poor quality control on the parking garage and conflict of interest against company policy regarding work with Watersedge (sic) Construction.” As noted above, I do not believe that either reason occasioned the firing. Moreover, I find that these recently contrived explanations are inconsistent with the evidence. Simply stated, if the small claims dispute over the waste removal had not arisen, Ferry would not have been terminated. Consequently, the defendants have not established just cause for terminating the plaintiff from his employment at Rosewood.
In concluding that Rosewood breached the contract by terminating Ferry, damages must now be addressed. Under accepted contract damage analysis, “(t]he measure of damages recoverable by an employee wrongfully discharged before the expiration of an employment contract is the wages he would have earned under the contract less what he did in fact earn or in the exercise of proper diligence might have earned in another employment.” Dickson v. Riverside Iron Works, Inc., 6 Mass.App.Ct. 53, 57 (1978). See McKenna v. Commissioner of Mental Health, 347 Mass. 674, 677 (1964). The burden of proving either that the employee found or in the exercise of proper diligence could have found other employment is on the employer. In the absence of such proof, the employee is entitled to receive the full amount of his salary under the contract. Black v. School Comm. of Malden, 365 Mass. 197, 212 (1974).
The damage calculation is straightforward. The plaintiff is entitled to the benefits under the contract including the lost salary, heath care contribution and pension benefits.
With respect to salary, the compensation that was lost was:
(1) for the period of December 21, 2001 to February 13, 2002 the amount of $12,477.
(2) for the period of February 14, 2002 to February 13, 2003, the amount of $82,800;
(3) for the period of February 14, 2003 to February 13, 2004 the amount of $82,800;
(4) for the period of February 14, 2004 to February 13, 2005, the amount of $82,800.
I am not awarding Ferry any compensation for loss of bonuses as this calculation is too speculative. Bonuses are based on the number of jobs that the plaintiff supervised and his performance and the record is insufficient to establish a reliable calculation on bonuses.
Consequently, the total loss of salary was $260,877.
With respect to the health care contribution, the health care contribution that was lost was $346.00/month for 38 months or $13,148.00.
With respect to the pension benefits, the pension contribution that was lost was $1,325.00.
Consequently, the total financial loss suffered by the plaintiff as a result of the breach of contract was $275,350.00.
The defendant is entitled to an offset for income that the plaintiff earned during the period of the contract that the plaintiff had been terminated from his employment at Rosewood. This issue is in dispute and the defendant has the burden of proof to establish the earning of the plaintiff that would offset the damages. The resolution of this issue is difficult. The parties introduced into evidence some income tax returns and financial statements for the purpose of detailing the income that the plaintiff earned in his construction business after he was terminated from Rosewood. Unfortunately, there was no expert testimony or analysis provided that would assist the court in understanding these documents; despite the fact that the documents contain entries that are suspicious. For example, in Schedule C of the 2002 tax return, Feriy deducts office expenses of $20,863 a considerable figure considering that he is essentially a one-man operation with a gross profit of only $89,387. In 2003 the office expenses increased to $30,582. However, the following year, 2004, he only has office expenses in the amount of $1,035.[14] There are other aspects of the tax returns that cause me some concern. The plaintiff admitted that approximately $36,600in business expenses on his taxes were actually personal expenses. This figure will be deducted from the damages.
Finally, the plaintiff continued his construction work after relocating to Arizona for a period of time and I find that he earned $12,000 for framing a house and $8,000 for a parking lot, for a total of $20,000. This figure will also be deducted from the damages.
Other than harboring great suspicion that these tax returns do not paint an accurate picture of the financial earnings of the plaintiff and, in fact, under-report his earnings, I do not have a reasonable basis to reject and substitute my own figures in these tax returns other than the $56,600, as noted above. Given that it is the defendant’s burden to establish the amount of the offset income, I will accept the net income earned by the plaintiff as reflected in the income tax returns.
The net income of the plaintiff is as follows:
(1) for the year 2003, the plaintiff earned $16,844;
(2) for the year 2004, the plaintiff earned $23,387;
(3) For the year 2005, the plaintiff earned $22,912.
*20 Consequently, the income earned by the plaintiff during the period of the contract after termination was $119,743 and this figure must be deducted from $275,350.00.
The defendants also assert that they are entitled to deduct from any damage award profits that the plaintiff made on properly he sold in Massachusetts and Arizona. This profit was derived from investment income not employment income, and neither the defendants nor my research revealed any authority to made such a deduction. Accordingly, I decline to make such a deduction.
Therefore, the plaintiff is entitled to damages in the amount of $155,607 on the breach of contract claim.

B. Assault and Battery

The plaintiff has also filed a claim for assault and battery with respect to the incident subsequent to the termination. As I have found above, DePietri did physically and without consent or justification touch the plaintiff, causing the plaintiff to fall to the ground. Contrary to the plaintiff s assertions, I find that the injury resulting from the contact to be minor, if not insignificant; more of an injury to the ego than anything else.
The Marlborough Hospital Record notes an ankle sprain, and documents pain at the left heel and Achilles tendon. The findings for such an injury are minimal and rest is advised. Follow-up medical care occurred on January 4, 2002 at the Falmouth Hospital. At this point the plaintiff complained of back pain that occurred two to four days prior to the admission. The ankle injury is not revisited with the medical staff. The plaintiff asserts that the back pain occurred approximately 10 days after the fall. According to Ferry’s testimony, the back condition resolved itself within a few weeks, but he continued to have problems with his ankle for several months. In any event, I find that the injuries were inconsequential and transient.
Based upon the injuries sustained by the plaintiff, as well as the medical and other expenses incurred, I find that the plaintiff has sustained damages in the amount of $5,000.00 for the assault and battery.

ORDER

IT IS HEREBY ORDERED:
1. That judgment enter in favor of the plaintiff, Richard A. Ferry as against Rosewood Construction Corporation on Counts I, II and III preach of Contract) in the amount of $155,607.00, with statutory interest and costs thereon.
2. That judgment enter in favor of the plaintiff, Richard A. Ferry as against William A. DePietri and Rosewood Construction Corporation on Counts IV, V, VI, and VII (Assault and Battery), jointly and severely in the amount of $5,000.00, with statutory interest and costs thereon.

The Court reserves its rights to make additional findings of fact in the Discussion section of this Decision.

William DePietri signed the agreement as Slazik had concerns that the company did not have sufficient work to satisfy the length of the commitment.

The contract did not define the term “industrial standards” nor was there any evidence offered during trial that would elucidate the contours of this standard.

The plaintiff appeared to have also operated a business called Water’s Edge Associates Constmction, Inc., a Massachusetts corporarion.

Rosewood, under the name of Slazik, sent the plaintiff formal written notice of his termination by fax and certified mail, dated December 26, 2001. The notice did not give any reason for the termination. Rosewood also terminated the services of Water’s Edge.

Xhe day before, Thursday December 20, 2001, Rosewood issued a final wage check to the plaintiff for 4.5 days, indicating that the decision to terminate Ferry occurred on either Wednesday (the day that the small claim notice was received) or on Thursday.

At trial, the defendants raised additional issues of Ferry’s failure to properly supervise other projects. I completely discount these claims as they were not identified on Slazik’s Chronology dated July 8, 2002. Moreover, it is extremely unlikely that Rosewood would offer the plaintiff such an extraordinary contract if such problems existed or were considered significant.

In determining whether an employee handbook or manual could potentially form the basis of a contract, one must look at 1) whether “there was negotiation over the terms of the personnel manual”; 2) whether “the employee signed the manual, manifested assent to it or acknowledged understanding of its terms”; and 3) whether “the manual provides only management directives or general guidance as to the employer’s policies, or whether it sets forth detailed mandatory conduct, mutual obligations, promises of treatment and benefits, and procedures for employees and employer to follow.” O’Brien, 422 Mass. at 692-93. In addition, “express disclaimers concerning the creation of contractual or legal rights are relevant, but not dispositive.” Id. at 691, 694.

Putting aside the issue of competence, the economic uncertainties in giving a contract for four years makes this a very unusual arraignment.

The confrontation took long enough for Congdon to receive a call from a project manager regarding an argument between Ferry and DePietri and drive 5 minutes to the shop, only to observe the argument go from the garage to the parking lot.

Congdon later told the plaintiff and Robert Main, a former employee of Rosewood, after he was confronted regarding the incident and his version, that he would be fired if he told the truth about the incident, i.e. that DePietri pushed Ferry. I accept Main’s testimony regarding this issue and discount Congdon’s testimony.

It is clear that the plaintiff did not lack experience, capacity or diligence. Indeed, Feny was valued highly, and Rosewood demonstrated this by its bonuses and entering into a four-year contract, an agreement that is unprecedented in the construction industry.

For example, the defendants assert that because one of the Towers was out of square, they were required to remove the roof and refabricate a section of the EFIS supporting the metal roof. This endeavor would clearly cost thousands of dollars, produce many documents (if not photographs) and provide witnesses for the defense.

Office expenses are typically limited to those items necessary to operate an office such as paper, pens, copiers, computers, etc. It would not include advertising, insurance or professional services.